CFN   2004018118
Bk 02505 Pgs 0192 - 195; (4pgs)
DATE: 02/11/2004  02:35:57 PM
JAMES C. WATKINS, CLERK OF COURT
LAKE COUNTY
RECORDING FEES 17.88
TRUST FUND 2.50

LOAN # 0021969654

Prepared By/Return To: LuAnn Foreg
   South Lake Title
   P.O. Box 120188
Clermont, Florida 34712

The quality of this image
is equivalent to the quality
of the original document.

### NOTE AND SECURITY INSTRUMENT MODIFICATION AGREEMENT

This Note Modification Agreement (this "Agreement") is entered into this 27th day of January, 2004 by and between Neil Dyer (herein individually and collectively referred to as "Borrower"),and HOMEBANC MORTGAGE CORPORATION, (herein referred to as "Lender").

**WHEREAS,** Lender is the owner and holder of that certain mortgage, deed of trust, or security deed (the "Security Instrument"), dated March 28, 2003 made by Borrower as trustor or mortgagor, as the case may be, to Lender as beneficiary or mortgagee, as the case may be, recorded on April 1st, 2003 as Book 2288 , Page 1303 , of the Public/Land Records of Lake County, Florida securing a debt evidenced by a promissory note ("the Note") dated March 28, 2003 in the original principal amount of $228,000.00, which Security Instrument encumbers the property known as 11243 Preston Cove Road, Clermont, Florida 34711 more particularly described in the attached Exhibit A; and

**WHEREAS,** the Borrower, being the owner in fee simple of all of the property encumbered by the Security Instrument, has requested that Lender modify the Note and the Security Instrument (but only to the extent that the Note is incorporated therein by reference), and the parties have mutually agreed to modify the terms thereof in the manner hereafter stated.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   As of the date of execution hereof, the terms and conditions of the Note, and the corresponding portions of the Security Instrument, are modified in the following respects, only:

   a)   Beginning on the first day of March 2004 and on the first day of every month thereafter until the first day of March 2009 Borrower will pay only the interest on the unpaid principal balance of the Note. Borrower's initial monthly interest only payment will be in the amount of $1,021.25 based on an initial interest rate of 5.375%. The interest rate is subject to change.

   b)   Beginning on the first day of March 2009 and on the first day of every month thereafter until the Note is paid in full, Borrower will make regular amortizing payments of principal and interest.

   c)   Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

   d)   The initial fixed interest rate I will pay will change to an adjustable rate on the 1st day of February 2009, and the adjustable rate I will pay may change on that day and every 6th month thereafter.

   e)   The monthly payments, determined precisely in the manner stated in the Note and giving effect to the modifications stated herein, shall continue until the entire indebtedness is fully paid, except that the final payment of the remaining indebtedness shall be due and payable on February 1, 2034.

NOTE TO RECORDING AUTHORITY: THIS INSTRUMENT MODIFIES A NOTE AND MORTGAGE UPON WHICH FLORIDA DOCUMENTARY STAMP TAX IN THE AMOUNT OF $_____AND INTANGIBLE TAX IN THE AMOUNT OF $_____ HAVE BEEN PAID AND AFFIXED TO OR NOTED UPON SAID MORTGAGE, AND EVIDENCES A QUALIFYING RENEWAL UNDER SECTION 201 09, F.S., AND SECTION 199.145(4)(a), F.S., UPON WHICH NO ADDITIONAL DOCUMENTARY STAMP TAX OR INTANGIBLE TAX IS DUE.

**EXHIBIT**

" A "

NO

OR BOOK 02505    PAGE 0193

The quality of this image
is equivalent to the quality
of the original document.

LOAN # 0021969654

(f)     Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & Three Fourths percentage point(s) (2.750%) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to limit stated below.

(g)     My interest rate will never be greater than 13.000% or less than 2.750%.

2.     The unpaid principal balance due under the Note as of the date of this Agreement is **$228,000.00.**

3.     Borrower warrants that Borrower has no existing right of offset, counterclaim, or other defenses against enforcement of the Note and Security Instrument by Lender and that, if any such right or defenses do exist, they are hereby waived and released.

4.     This Agreement shall supersede for all purposes any and all conflicting terms and conditions provided for in the Note and Security Instrument, but shall be construed as supplemental as to any non-conflicting term or condition stated therein. The Note and Security Instrument shall continue to evidence and secure the Borrower's indebtedness thereunder as modified herein. The parties intend and agree that this Agreement is not a novation of Borrower's loan obligation. Except to the extent provided otherwise herein, neither the Note nor the Security Instrument is modified by this Agreement and they shall remain in full force and effect until the obligations secured thereunder are paid in full and the Security Instrument is satisfied of record.

5.     This Agreement shall inure to the benefit of, and shall be binding upon, the assigns, successors in interest, personal representatives, estates, heirs, and legatees of each of the parties hereto.

6.     If the spouse of the Borrower, is not obligated on the Note, (i) then this Agreement has been executed by the spouse of the Borrower only to evidence his/her consent to the modifications of the Note and Security Instrument described herein and to the other terms hereof; and (ii) said spouse shall not be personally obligated to pay the sums owed under the terms of the Note and this Agreement.

7.     This Agreement contains the entire agreement of the parties hereto with regard to modification of the Note and supersedes any prior written or oral agreements between them concerning the subject matter contained herein, and no party hereto has relied upon any representations except such as are specifically set forth herein. This Agreement may not be modified, changed or amended except by written instrument signed by Lender and Borrower. This Agreement shall be governed by the laws of the state in which the property encumbered by the Security Instrument is located.

Executed on the date first above written.

Merrill Lynch Note Modification Agreement 5/6, 7/6, 10/6 Month LIBOR
Georgia(6/00)  PLTLF-#.frm

OR BOOK 02505     PAGE 0194

LOAN # 0021969654

The quality of this image is equivalent to the quality of the original document.

BORROWERS:

Name: _LeeAnn Foerg_ (Witness)

Neil Dyer _1874 Jimson ave._
_Ocoee, FL. 34761_ _____ (Seal)

Name: _Dana Purvis_ (Witness)

_____ (Seal)

Name: _____ (Witness)

_____ (Seal)

Name: _____ (Witness)

_____ (Seal)

By: _____
Donna L. Cribbs, VP HomeBanc Mortgage Corporation

*HOMEBANC MORTGAGE CORPORATION*
*CORPORATE*
*SEAL*
*DELAWARE*

STATE OF ~~GEORGIA~~ FLORIDA
COUNTY OF _LAKE_

On  JANUARY ~~00~~ 27,  2004 ~~,2003~~ before me, the undersigned, a Notary Public in and for said state, personally appeared _Neil Dyer_ personally known to me (or proved to me on the basis of satisfactory evidence in the form of _drivers license_ ) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their <u>authorized capacity</u>(ies) and that by his/her/their signature(s) on the instrument the person(s) executed the instrument as his/her/their free act and deed.

WITNESS my hand and official seal.

Name: _____
Notary Public, State of _____
Commission No.: _____
My Commission Expires _____

LINDA PEAVEY
MY COMMISSION # DD 103265
EXPIRES January 20, 2006
Bonded Thru Budget Notary Services

STATE OF GEORIGA
COUNTY OF FULTON

The foregoing instrument was acknowledged before me this _24th_ day of _January_ , 2004 ~~2003~~, by _Donna L. Cribbs  VP_ of HomeBanc Mortgage Corporation, on behalf of the corporation. He/she is personally known to me.

*AMBER L. SETCHEL*
*NOTARY*
*My Comm. Exp.*
*April 7, 2006*

Name: _Amber L. Litchel_
Notary Public, State of _Georgia_
Commission No.: _____
My Commission Expires: _4/7/06_

Merrill Lynch Loan Modification Agreement 5/1, 7/1, 10/1 Month LIBOR
Georgia (6/00) RM LLM.frm

Page 3 of 4

Case 5:17-cv-00130-JSM-PRL   Document 1-2   Filed 03/28/17   Page 4 of 90 PageID 17

OR BOOK 02505    PAGE 0195

LOAN # 0021969654

The quality of this image
is equivalent to the quality
of the original document.

## EXHIBIT A

Lot 90, Preston Cove, according to the Plat thereof as recorded in Plat Book 34, Pages 34-36, of the Public Records of Lake County, Florida.

Merrill Lynch Note Modification Agreement 5/6, 7/6, 10/6 Month LIBOR
Georgia(6/00)  PLTLF-#.frm

Page 4 of 4

Prepared By/Return To:
South Lake Title
P.O. Box 120188
Clermont, Florida 34712

JESSICA FISMING
SL03 307

After Recording ~~Return To:~~
HOMEBANC MORTGAGE CORPORATION

P.O. BOX 105830

ATLANTA, GEORGIA 30348-5830

CFN   2003039105
Bk 02288 Pgs 1303 - 1321; (19pgs)
DATE: 04/01/2003  03:00:52 PM
JAMES C. WATKINS, CLERK OF COURT
LAKE COUNTY
RECORDING FEES 77.00
TRUST FUND 10.00
MTG DOC 798.00
INTANGIBLE 456.00

_____[Space Above This Line for Recording Data]_____

## MORTGAGE  LOAN NO. 2196954

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   MARCH 28, 2003
together with all Riders to this document.
(B) "Borrower" is NEIL DYER, A SINGLE MAN

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is HOMEBANC MORTGAGE CORPORATION

Lender is  A CORPORATION                                    organized and existing under the laws of
THE STATE OF DELAWARE          . Lender's address is  5775-E GLENRIDGE DRIVE,
SUITE 500, ATLANTA, GEORGIA 30328
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated   MARCH 28, 2003          . The
Note states that Borrower owes Lender TWO HUNDRED TWENTY-EIGHT THOUSAND AND NO/100-

Dollars (U.S. $   228,000.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   APRIL 1, 2034          .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower [check box as applicable]:                          CONSTRUCTION RIDER

☒ Adjustable Rate Rider        ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider                ☒ Planned Unit Development Rider  ☒ Other(s) [specify]
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider         Construction Rider
   ~~LEGAL ATTACHED~~

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(I) "Community Association Dues, Fees and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

INITIALS _ND_

OR BOOK 02288   PAGE 1304

LOAN NO. 2196954

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the       COUNTY             of       LAKE                      :
                  [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

          Lot 90, Preston Cove, according to the plat thereof as recorded
          in Plat Book 34, Pages 34-36, of the Public Records of Lake
          County, Florida.

which currently has the address of   LOT 90 PRESTON COVE ROAD
                                                    [Street]
CLERMONT                       , Florida 34711      ("Property Address"):
      [City]                             [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

INITIALS _____

Form 3010   1/01

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
UIFL3010.02-08/00        28134.12671                    Page 2 of 11

LOAN NO. 2196954

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender

INITIALS _____

OR BOOK 02288   PAGE 1306

LOAN NO. 2196954

receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

INITIALS ___

LOAN NO. 2196954

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

LOAN NO. 2196954

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until the Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

LOAN NO. 2196954

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the forgoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

INITIALS

Form 3010   1/01

LOAN NO. 2196954

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one

INITIALS  ____
Form 3010   1/01

LOAN NO. 2196954

designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

INITIALS _MD_

LOAN NO. 2196954

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23.  Release.  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  Attorneys' Fees.  As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

OR BOOK 02288   PAGE 1313

LOAN NO. 2196954

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Witness        LINDA PEAVEY          Witness    JESSICA FLEMING

_____ (Seal)      _____ (Seal)
NEIL DYER            -Borrower                     -Borrower
1874 Jimson Ave.
Ocoee, FL  34761

_____ (Seal)      _____ (Seal)
                   -Borrower                     -Borrower

_____ (Seal)      _____ (Seal)
                   -Borrower                     -Borrower

_____ [Space Below This Line For Acknowledgment] _____

STATE OF FLORIDA             )       STATE OF FLORIDA             )

COUNTY OF Lake_____ )       COUNTY OF _____ )

The forgoing instrument was acknowledged before me this 28th day of March, 2003 , by Neil Dyer who is personally known to me or who has produced drivers license as identification.

The forgoing instrument was acknowledged before me this ____ day of _____ , by _____ who is personally known to me or who has produced _____ as identification.

Name: _____
Notary Public, State of Florida
Commission No. _____
My Commission Expires: _____

Name: _____
Notary Public, State of Florida
Commission No. _____
My Commission Expires: _____

LINDA PEAVEY
MY COMMISSION # DD 103285
EXPIRES: January 20, 2006
Bonded Thru Budget Notary Services

OR BOOK 02288  PAGE 1314

# FIXED/ADJUSTABLE RATE RIDER
## (LIBOR Index - Rate Caps)

LOAN NO. 2196954

THIS FIXED/ADJUSTABLE RATE RIDER is made this 28th day of MARCH, 2003 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to HOMEBANC MORTGAGE CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

LOT 90 PRESTON COVE ROAD, CLERMONT, FLORIDA 34711

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN THE BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of __SEE CONSTRUCTION RIDER__ %. The Note also provides for change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the 1st day of APRIL, 2009 and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my interest rate could change is called a "Change Date."

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding ** SEE CONSTRUCTION RIDER percentage point(s) ( ** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

LOAN NO. 2196954

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

My interest rate will never be greater than       **       %, which is called the 'Maximum Rate", or less than     **     %.         **SEE CONSTRUCTION RIDER

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any change in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

OR BOOK 02288    PAGE 1316

LOAN NO. 2196954

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer or title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
NEIL DYER                 Borrower                                   Borrower

_____ (Seal)          _____ (Seal)
                          Borrower                                   Borrower

_____ (Seal)          _____ (Seal)
                          Borrower                                   Borrower

LOAN NO. 2196954

## CONSTRUCTION RIDER TO FIXED/ADJUSTABLE RATE RIDER TO SECURITY INSTRUMENT

THIS CONSTRUCTION RIDER TO FIXED/ADJUSTABLE RATE RIDER TO SECURITY INSTRUMENT is made this 28th day of MARCH, 2003 , and is incorporated into and shall be deemed to amend and supplement the FIXED/ADJUSTABLE RATE RIDER TO SECURITY INSTRUMENT of the even date herewith executed by NEIL DYER

(the "Borrower") to

HOMEBANC MORTGAGE CORPORATION
(the "Lender") in the amount of TWO HUNDRED TWENTY-EIGHT THOUSAND AND NO/100-----
($ 228,000.00 ) (the "FIXED/ADJUSTABLE RATE RIDER").

In addition to the covenants and agreements made in the FIXED/ADJUSTABLE RATE RIDER, Borrower and Lender futher covenant and agree as follows:

The FIXED/ADJUSTABLE RATE RIDER is for a combined construction and permanent loan. The FIXED/ADJUSTABLE RATE RIDER shall be entitled to the benefits of the terms and conditions of that Construction Loan Agreement of even date herewith (the "Loan Agreement"), which Loan Agreement provides for periodic advances of the principal amount of the FIXED/ADJUSTABLE RATE NOTE for the purpose of constructing a residence on the real property securing the FIXED/ADJUSTABLE RATE NOTE (the "Improvements").

Notwithstanding the terms and provisions of the FIXED/ADJUSTABLE RATE RIDER, interest shall be calculated during the period (the "Construction Period") beginning on the date of the FIXED/ADJUSTABLE RATE NOTE or the date on which the Lender makes the first advance under the FIXED/ADJUSTABLE RATE NOTE, whichever is later, and ending on MARCH 31, 2004 (the "Construction Period Maturity Date"), as follows:

Interest shall accrue from time to time on the outstanding unpaid principal balance of the FIXED/ADJUSTABLE RATE NOTE that is not past due at an interest rate during the Construction Period, as indicated by the appropriate box:

☐ at an interest rate equal to the interest rate of the FIXED/ADJUSTABLE RATE NOTE; or

☒ at a varying Rate per annum (the "Rate") equal to the lesser of (a) the Highest Lawful Rate or (b) the "Prime Rate" (as hereinafter defined) plus ZERO AND ONE/HALF- ( 0.500 %) per annum. In the event the Prime Rate exceeds the Highest Lawful Rate, and to the extent permitted by applicable law, the Rate shall be limited to the Highest Lawful Rate. Lender's "Prime Rate" will be the prime rate as published in The Wall Street Journal's "Money Rates" table. If multiple prime rates are quoted in the table, then the highest prime rate will be the Prime Rate. In the event that the prime rate is no longer published in the "Money Rates" table, then Lender will choose a substitute Prime Rate which is based upon comparable information. The "Highest Lawful rate" shall be the maximum nonusurious rate of interest per annum permitted by whichever applicable United States federal law or state law that permits the highest interest rate including, to the extent permitted by applicable law, any amendments thereof or any new law hereinafter coming into effect to the extent a higher rate is permitted thereby.

☒ The outstanding principal balance during the construction phase may be prepaid in part at any time without a penalty. However, if the entire construction balance is paid, a penalty of 1% will be incurred. Any prepayment you make will be applied to the outstanding principal balance. Partial payments will not delay the due date of the subsequent monthly due date. Any reductions in monthly interest payments due to a partial prepayment may be offset by an increase in the construction interest rate.

OR BOOK 02288   PAGE 1318

LOAN NO. 2196954

Interest shall be payable monthly in arrears beginning on the first (1st) day of the calendar month immediately following the date hereof and on the first (1st) day of each successive calendar month thereafter until the Construction Period Maturity Date, when the last payment of interest only shall be due and payable.

It is expressly understood and agree that upon default in the punctual payment of any installment hereof, as the same shall become due and payable, or in the performance of any warranty, covenant or agreement, or other default under the terms of the Security Instrument of even date given as security for the payment hereof, or under any other instrument granted to secure payment hereof or executed in connection herewith (including the Loan Agreement), Lender may declare the then unpaid principal balance and accrued interest thereon immediately due and payable.

Notwithstanding any other provision of the FIXED/ADJUSTABLE RATE NOTE, Security Instrument, or other instrument further evidencing and/or securing the FIXED/ADJUSTABLE RATE NOTE, prior to the Construction Period Maturity Date, Borrower and all sureties, guarantors and endorsers of the FIXED/ADJUSTABLE RATE NOTE severally (i) waive all notices, demands, presentments for payment, notices of non-payment, notices of intentions to accelerate the maturity, notices of acceleration, notices of dishonor, protest and notice of protest, diligence in collection or bringing suit as to the FIXED/ADJUSTABLE RATE NOTE and as to each, every and all installments hereof and all obligations hereunder and against any party hereto and to the application of any payment on this obligation, or as an offset hereto, and (ii) agree to all extensions, renewals, partial payments, substitutions or evidence of indebtedness and the taking, release or substitution of all or any part of the herein described or referenced security or the release of any party liable hereon with or without notice before and after maturity.

Failure to complete construction of the Improvements as described in the Loan Agreement by any date later than thirty (30) days prior to the Construction Period Maturity Date shall constitute an event of default under the Security Instrument and under the Loan Agreement. Lender, at its sole discretion, and on terms and conditions acceptable to it, may elect to extend the completion date and Construction Period Maturity Date to a date not more than one hundred eighty (180) days subsequent thereto to facilitate the completion of construction.

Any amount of principal not advanced prior to the Construction Period Maturity Date may be funded into escrow with the Lender on such Construction Period Maturity Date, and advances made out of such escrow to the Borrower after the Construction Period Maturity Date. Alternatively, any funds not advanced under the Loan Agreement upon completion of the construction of the Residence prior to the Construction Period Maturity Date may, at Lender's option, be credited against the stated principal amount of the FIXED/ADJUSTABLE RATE NOTE on such Construction Period Maturity Date. Any portion of a payment received in excess of interest due shall be applied to principal.

Upon Rollover, the interest in effect for the permanent financing shall be determined as indicated below:

[X] Prior to the Construction Period Maturity Date, Borrower must notify Lender to utilize a forty-five (45) day lock ("lock-in") to establish the interest rate on Borrower's loan at a rate established by the Lender. If such interest rate is not locked-in, beginning on the Construction Period Maturity Date, interest shall accrue at an interest rate two percent (2%) in excess of the then prevailing market interest rate for the particular loan program upon which the terms of the FIXED/ADJUSTABLE RATE NOTE and Security Instrument were based. Monthly payments of principal and interest shall then be due and payable pursuant to the terms of the FIXED/ADJUSTABLE RATE NOTE. Borrower agrees to execute an Modification Agreement at Rollover which shall be in form and content as Lender shall reasonably require causing the Interest Rate, Margin and Index Conversion Options of the FIXED/ADJUSTABLE RATE NOTE and FIXED/ADJUSTABLE RATE RIDER to be changed in accordance with the provisions set forth above. Failure of the Borrower to execute such Modification Agreement shall constitute default under the FIXED/ADJUSTABLE RATE NOTE, and the Security Instrument of which this Rider forms a part.

OR BOOK 02288   PAGE 1319

LOAN NO. 2196954

☐   Monthly payments of principal and interest shall be due and payable pursuant to the terms of the FIXED/ADJUSTABLE RATE NOTE.

The occurrence of any of the matters described herein may cause changes in the monthly payment amounts as well as the maturity date of the FIXED/ADJUSTABLE RATE NOTE and Security Instrument and/or necessitate a redisclosure of certain aspects of the loan transaction.  Borrower hereby agrees that upon the occurrence of any of the foregoing, Borrower, at Lender's request, shall execute those documents which Lender deems necessary or appropriate to properly evidence any such changes.  Borrower's failure to execute such documents(s) reflecting any such changes shall constitute an event of default under the FIXED/ADJUSTABLE RATE NOTE, Security Instrument and the Loan Agreement.  Except as may be required by applicable law, Lender will not provide Borrower notice of interest rate changes during the construction period.

Any provision in the FIXED/ADJUSTABLE RATE NOTE or Security Instrument permitting the Borrower to transfer property that is security for the FIXED/ADJUSTABLE RATE NOTE shall be effective during the Construction Period.  Unless prohibited by applicable law, any transfer of property securing the FIXED/ADJUSTABLE RATE NOTE during the Construction Period shall constitute an event of default, pursuant to which Lender may exercise any and all remedies afforded to it pursuant to the terms and provisions of the FIXED/ADJUSTABLE RATE NOTE, Security Instrument and/or Loan Agreement.

_____(Seal)          _____(Seal)
NEIL DYER                        Borrower                                         Borrower

_____(Seal)          _____(Seal)
                                 Borrower                                         Borrower

_____(Seal)          _____(Seal)
                                 Borrower                                         Borrower

Rider
HP431161.A05-11/02     28134.12871              Page 3 of 3

LOAN NO. 2196954

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 28th day of MARCH, 2003
, and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the
undersigned (the "Borrower") to secure Borrower's Note to   HOMEBANC MORTGAGE CORPORATION

(the "Lender") of the same date and covering the Property described in the Security Instrument and located
at:
LOT 90 PRESTON COVE ROAD, CLERMONT, FLORIDA 34711

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
Covenants, Conditions and Restrictions

(the "Declaration"). The Property is a part of a planned unit development known as
PRESTON COVE
[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and
the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws
or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues
and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and
which provides insurance coverage in the amounts (including deductible levels), for the periods, and against
loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but
not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the
provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property
insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance
coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the
Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage
provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following
a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower
are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by
the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that
the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent
of coverage to Lender.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
UR3XX3150.01-09/00  28134.12871                     Page 1 of 2

INITIALS ___

Form 3150  1/01

OR BOOK 02288   PAGE 1321

LOAN NO. 2196954

D. Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. Remedies. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)
NEIL DYER                        Borrower

_____ (Seal)
                                 Borrower

_____ (Seal)
                                 Borrower

_____ (Seal)
                                 Borrower

_____ (Seal)
                                 Borrower

_____ (Seal)
                                 Borrower

MULTISTATE PUD RIDER - Single Family - Fannie Mac/Freddie Mac UNIFORM INSTRUMENT
URXX3150.02-09/00   28134.12871                    Page 2 of 2                         Form 3150  1/01

CFN  2008055145
Bk 03622 Pg 2373; (1pg)
DATE: 05/07/2008  09:38:14 AM
NEIL KELLY, CLERK OF COURT
LAKE COUNTY
RECORDING FEES 10.00

When Recorded Return To:
EMC MORTGAGE CORPORATION
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan #: 0022551253



### ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **HOMEBANC MORTGAGE CORPORATION, WHOSE ADDRESS IS FIVE CONCOURSE PARKWAY, SUITE 3000 , ATLANTA, GA 30328, (ASSIGNOR),** by these presents does convey, grant, sell, assign, transfer and set over the described mortgage together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to **EMC MORTGAGE CORPORATION, WHOSE ADDRESS IS 2780 LAKE VISTA DRIVE , LEWISVILLE, TX 75067, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).** Said Mortgage was made by **NEIL DYER** and was recorded in Official Records of the Clerk of the Circuit Court of LAKE  County, Florida, in Book 2288 , Page 1303 or Instr #
upon the property situated in said State and County as more fully described in said mortgage.

Dated: 04/23/2008
HOMEBANC MORTGAGE CORPORATION

By: _____
      CRYSTAL MOORE    VICE PRESIDENT
Whose address is: FIVE CONCOURSE PARKWAY, SUITE 3000 ,  ATLANTA, GA 30328

STATE OF FLORIDA            COUNTY OF Pinellas
I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State and County aforesaid to take acknowledgements personally appeared CRYSTAL MOORE  well known to me to be the VICE PRESIDENT  of HOMEBANC MORTGAGE CORPORATION , a corporation, and that she/he acknowledged executing the same freely and voluntarily under authority duly vested in them by said corporation. WITNESS my hand and official seal in the County and State last aforesaid THIS 23RD DAY OF APRIL IN THE YEAR 2008

BRYAN J. BLY    Notary Public
My commission expires: 07/01/2011

Bryan J. Bly
Notary Public, State of Florida
Commission # DD 391055
Expires July 01, 2011
Bonded Through National Notary Assn.

Document Prepared By: J. Lesinski/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

EMCAG 8508288      EVER ENH1800362

# EXHIBIT
## "B"

form5/FRMFL1

RECORDING REQUESTED
AND PREPARED BY:
T.D. Service Company
1820 E. First St., Suite 300
Santa Ana, CA 92705
(714) 543-8372
MICHELLE M. HESS

And When Recorded Mail To:
Customer: 608
Service #: 3462133/ASF
Loan #: 0022551253

RETURN TO

**MARSHALL C. WATSON, P.A.**
1800 NW 49th Street • Suite 120
Fort Lauderdale, Florida 33309

## ASSIGNMENT OF MORTGAGE

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **EMC MORTGAGE CORPORATION, 2780 LAKE VISTA DR. LEWISVILLE TX 75067-3884**. By these presents does convey, grant, bargain, sell, assign, transfer and set over to: **THE BANK OF NEW YORK MELLON FORMERLY KNOWN AS THE BANK OF NEW YORK AS SUCCESSOR TRUSTEE TO JPMORGAN CHASE BANK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., BEAR STEARNS ALT-A TRUST, MORTGAGE PASS-THROUGH CERTIFICATES, C/O EMC MORTGAGE CORPORATION__ 2780 LAKE VISTA DRIVE_____ LEWISVILLE_____ TX 75067-0000**. The described Mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$228,000.00** is recorded in the State of **FLORIDA**, County of **LAKE** Official Records, dated **MARCH 28, 2003** and recorded on —, as Instrument No. —, in Book No. **2288**, at Page No. **1303**.
Original Mortgagor: **NEIL DYER**. Original Mortgagee: **HOMEBANC MORTGAGE CORPORATION**.
Date: **MAY 20, 2009**
**EMC MORTGAGE CORPORATION**

By: _____
Craig Davenport, Authorized Signer

WITNESS:

_____
(Name):  **S. ALDRICH**
State of    **CALIFORNIA**                          }
County of   **ORANGE**                              } ss.

(Name): _____  E. Vaccaro

On **MAY 20, 2009** , before me, J. Rios, a Notary Public, personally appeared   Craig Davenport , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

_____
(Notary Name): J. Rios

J. RIOS
COMM. # 1597945
NOTARY PUBLIC CALIFORNIA
ORANGE COUNTY
My comm. expires Aug. 23, 2009

EXHIBIT

" C "

11-16071

IN THE COUNTY COURT, IN AND FOR
THE FIFTH CIRCUIT, IN AND
FOR LAKE COUNTY, FLORIDA
CASE NO.:  2013 CA 002850

THE BANK OF NEW YORK MELLON F/K/A
THE BANK OF NEW YORK, AS SUCCESSOR-IN-INTEREST
TO JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
F/KA JPMORGAN CHASE BANK, AS TRUSTEE FOR
STRUCTURED ASSET MORTGAGE INVESTMENTS II
INC, BEARS STEARNS ALT-A-TRUST, MORTGAGE
PASS-THROUGH CERTIFICATES SERIES 2004-5,

          Plaintiff,

v.

NEIL DYER, et al.

          Defendants,

_____/

## ORDER ON MOTION TO RESET FORECLOSURE SALE

THIS CAUSE, having come on to be heard on the Plaintiff's Motion to Reset Foreclosure

Sale in this action, and the Court, having reviewed the Motion, hereby states it is:

**ORDERED AND ADJUDGED:**

1.     The Motion to Reset Foreclosure Sale is hereby GRANTED.

2.     The Foreclosure Sale is rescheduled for March 30, 2017, at 11:00 a.m.

3.     _____.

DONE AND ORDERED in Lake County, Florida, this 9 day of

Feb. , 2017.

          /S/ MARK J. HILL

_____
          Circuit Judge

cc: all parties on attached service list

1198819.1

# EXHIBIT
## " D "



IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR CLAY COUNTY, FLORIDA
CASE NO. 2009-CA-1920
DIVISION B

DEUTSCHE BANK NATIONAL TRUST
COMPANY AS TRUSTEE IN TRUST
FOR THE BENEFIT OF THE
CERTIFICATE HOLDERS FOR
AMERIQUEST MORTGAGE SECURITIES
TRUST 2005-R9, ASSET-BACKED
PASS-THROUGH CERTIFICATES
SERIES 2005-R9,

ORIGINAL

    Plaintiff,

vs.

GARY L. HANNAH, et al,

    Defendants.

-------------------------------/


DEPOSITION OF:  BRYAN J. BLY

TAKEN:          Pursuant to Notice by
                  Counsel for Defendants

DATE:           July 2, 2010

TIME:           2:03 p.m. – 3:50 p.m.

LOCATION:      Akerman Senterfitt
                  401 East Jackson Street, Suite 1700
                  Tampa, Florida

REPORTER:      DAVID L. KELLY
                  Notary Public
                  State of Florida at Large


**MAXA ENTERPRISES, INC.**
1275 Cleveland Street
Clearwater, Florida 33755
(727) 441-2404   Fax: (727) 448-0028

# EXHIBIT
" E "

2

APPEARANCES:     ADINA L. POLLAN, ESQ.
                 WILLIAM HELLER, ESQ. (by telephone)
                 Akerman Senterfitt
                 50 North Laura Street, Suite 2500
                 Jacksonville, FL  32202-3646

                 Attorney for the Plaintiff


                 GLORIA A. EINSTEIN, ESQ.
                 Jacksonville Area Legal Aid, Inc.
                 P.O. Box 1999
                 Green Cove Springs, FL  32043

                 Attorney for the Defendant

ALSO PRESENT:    Raye Blair


<u>INDEX</u>                              <u>PAGE NUMBER</u>

     Examination by Ms. Einstein          3
     Examination by Ms. Pollan            59
     Examination by Ms. Einstein          60


<u>EXHIBITS</u>                           <u>PAGE NUMBER</u>

     Deposition Exhibit Number 1          5
     Deposition Exhibit Number 2          8
     Deposition Exhibit Number 3          8
     Deposition Exhibit Number 4          8
     Deposition Exhibit Number 5          21


        Maxa Enterprises, Inc.     (727) 441-2404

3

```
 1              MS. EINSTEIN:  Okay.  Are we going to
 2       stipulate that the notice was sufficient and
 3       Mr. Bly's appearance here is pursuant to notice --
 4              MS. POLLAN:  Yes.
 5              THE COURT:  -- pursuant to subpoena, and
 6       Mr. Bly is a nonparty?
 7              MS. POLLAN:  Yes.
 8   THEREUPON
 9              BRYAN J. BLY,
10       After being duly sworn an oath was examined and
11       testified as follows:
12              THE DEPONENT:  I do.
13                   EXAMINATION
14   BY MS. EINSTEIN:
15       Q    Okay.  And you are represented by your
16   counsel, Ms. Pollen; is that correct?
17       A    Correct.
18       Q    Okay.  There's some ground rules of
19   depositions.  One is if you need a break for any
20   reason just ask, and we'll stop and start again.
21              As you can see, this court reporter is
22   typing.  So he can't type "uh-huh" or "huh-uh" very
23   well, and he can't type nods or shaking your head at
24   all.  So, if you would, say yes or no.  That would
25   really help.
```

Maxa Enterprises, Inc.    (727) 441-2404

4

1      Also he can't type two things at once very

2 well.  So if you would please let me finish my

3 question before you answer, and I will try to let you

4 finish your answer before I start another question.

5      The most important thing is if you don't

6 understand any of my questions, please ask, and I'll

7 rephrase it so that you do.  Okay?  What is your

8 name, sir?

9      A    Bryan Jay Bly.

10      Q    Does the "J" stand for something in

11 particular?

12      A    J-a-y is my middle name.

13      Q    Oh, okay.  All right.  And your business

14 address?

15      A    It's 2100 Alternate 19, Palm Harbor.

16      Q    Okay.  And that's in Florida, of course?

17      A    Correct.

18      Q    Have you had your deposition taken before?

19      A    No.

20      Q    Okay.  You have been served with subpoenas

21 in other depositions that you didn't give, haven't

22 you?

23      A    I don't know.

24      Q    Okay.  Do you recall one that was supposed

25 to be on June 2nd, just exactly a month ago, that you

5

1    were served with a subpoena?

2      A   I remember signing for one.  I didn't know

3    what the details were.

4      Q   Okay.  And do you know that Erika Lance gave

5    that deposition instead?

6         MS. POLLAN:  Okay.  I'm going to go ahead

7      and object, and I would like for the record -- I'm

8      going to give you an exhibit.  This is the order

9      that was signed yesterday by Judge Wilkes, and I

10    apologize I don't have it.

11         MS. EINSTEIN:  I have it.

12         MS. POLLAN:  Okay.  I'm going to give this

13      to the court reporter.  If you could attach this

14      as Exhibit 1.

15      (Deposition Exhibit Number 1 was marked for

16    identification.)

17         MS. POLLAN:  This is an order, for the

18      record, that specifically limits what Mr. Bly will

19      be talking about today.  Specifically I'm going to

20      read it.  It says:

21      Non-party Bryan J. Bly will only be required

22      to bring to the deposition those documents that he

23      has in his possession, custody or control.  The

24      scope of the deposition will be strictly limited

25      only to Bryan J. Bly signing the assignment of

6

1    Mr. Hannah's mortgage in his capacity as Vice

2    President for Citi Residential Lending, Inc.

3         Items 1-2, 8-9, 16 and 20 are stricken from

4    the subpoena duces tecum for deposition as

5    irrelevant.  Bryan Bly will not be required to

6    bring to the deposition any documents regarding

7    these items, and any questioning about these items

8    will not be permitted.

9         Further, any questioning regarding Bryan Bly

10   signing other mortgage assignments for any other

11   entities is prohibited.

12        I'm going to object and instruct him not to

13   answer because that has nothing to do with this

14   case.

15        MS. EINSTEIN:  Okay.  And I would respond

16   that it is very typical to ask people about having

17   depositions before at a deposition.

18        MS. POLLAN:  You're asking about Erika

19   Lance's deposition.

20   Q    (By Ms. Einstein)  Do you remember being

21   served with notice in this deposition?

22   A    Yeah.  I guess so.  I don't remember what

23   the subpoena was exactly for that I signed.

24   Q    Okay.  Do you remember being served with a

25   subpoena on May 13th of this year?

7

1    A    I remember being served a subpoena that I
2    turned over to my boss as far as that goes.
3    Q    Do you remember that there was a list of
4    things to bring with you?
5    A    I didn't receive a list then.  I mean, the
6    only thing I know what I'm supposed to bring is
7    through my attorney.
8    Q    Okay.
9            MS. POLLAN:  If you'd like, I can go ahead
10   and give you what he's given to me to produce
11   or --
12           MS. EINSTEIN:  I would, but I would also
13   like to see whether he can identify the subpoena
14   that he was --
15           MS. POLLAN:  Yeah, sure.  He can go ahead.
16   I'll just -- do you want me to do this now or --
17           MS. EINSTEIN:  Yes.  Go ahead.
18           MS. POLLAN:  Okay.  Mr. Bly has given me
19   to produce -- he doesn't have this, but it's
20   from -- it's called The Unanimous Written Consent
21   and a Limited Power of Attorney.
22           I believe Ms. Einstein has seen this before,
23   but I'm going to go ahead and give them to the
24   court reporter.
25           MS. EINSTEIN:  Okay.  Would you mark

Maxa Enterprises, Inc.    (727) 441-2404

8

```
 1        those, please?  Call the Unanimous Written

 2        Consent -- well, call the Limited Power of

 3        Attorney Exhibit 3.

 4             (Deposition Exhibit Number 3 was marked for

 5        identification.)

 6             MS. EINSTEIN:  And the Unanimous Written

 7        Consent as Exhibit 4.

 8             (Deposition Exhibit Number 4 was marked for

 9        identification.)

10             MS. EINSTEIN:  And let's call this copy of

11        the subpoena Exhibit 1 -- I'm sorry, 2.  1 was the

12        order.

13             (Deposition Exhibit Number 2 was marked for

14        identification.)

15        Q    (By Ms. Einstein)  Okay.  Now, the lines are

16        things that Judge Wilkes decided you did not have to

17        bring, but without the lines, do you remember seeing

18        this particular document before?

19        A    Vaguely.

20        Q    Okay.  Do you recognize it as having a list

21        of documents you were suppose to bring with you to

22        the deposition?

23        A    Yes.

24        Q    Okay.  And you said you gave it to your

25        supervisor or your boss?  What did you say exactly
```

9

```
1    who you gave it to?

2        A     Basically I gave it to Erika Lance after I

3    signed for the subpoena.

4        Q     Okay.  And did you discuss it with Erika

5    Lance?

6        A     Not at that time.

7        Q     Okay.  Did you ever discuss it with someone

8    who wasn't your lawyer?

9        A     No.

10       Q     Okay.  All right.  Give that back to the

11   court reporter now.  Well, you recognize that there

12   is a list of things.  And as your lawyer said, Judge

13   Wilkes said there were certain things you didn't have

14   to produce, but there is some things that you did.

15           So I'm going to ask you about each one, and

16   if you didn't produce it, I'd like you to tell me

17   whether there is such a thing, and if there is, why

18   you didn't -- whether you have it and why you didn't

19   produce it.

20           The first thing is item three:  Any

21   corporate resolution or other document showing your

22   position or authority with Citi Mortgage, Inc.?

23       A     That was submitted.

24       Q     Okay.  What was submitted was one with Citi

25   Residential Lending.  Is there one with Citi
```

10

1   Mortgage, Inc.?

2       A    I don't know.

3       Q    Okay.  Number four is:  Any corporate

4   resolution or other document showing your position or

5   authority with Ameriquest Mortgage Company.

6       A    I don't know.

7       Q    Do you -- is what you don't know whether

8   such a thing exists or you don't know why you don't

9   have it with you today?

10      A    I know it exists, but they were never in my

11  possession.

12      Q    Okay.  And number five is the same question

13  regarding Citi Residential Lending, and that is the

14  thing you produced, which we will call Exhibit 4.

15           Just to make things simple, let's call Citi

16  Residential Lending "Citi" from now on.  Okay?  All

17  right.  Now, is Exhibit 4, which -- do you need to

18  see it again?

19      A    No.

20      Q    Okay.  Is that the only corporate resolution

21  or other document showing your position or authority

22  with Citi Residential Lending, which we're now

23  calling Citi?

24      A    I don't know.

25      Q    Have you ever seen another one?

11

1     A     They're not in my possession.

2     Q     Okay.  Okay.  Was this one in your

3  possession?

4     A     The only time I saw it was yesterday in

5  preparation.

6     Q     Okay.  When did you first find out that it

7  existed?

8     A     I knew they existed because when we sign an

9  account our names are applied to submit for the

10  corporate resolutions.

11     Q     Okay.  And how did you know when the

12  resolution actually was finalized or approved?

13     A     We can't sign before it is.

14     Q     Okay.

15     A     It's that simple.

16     Q     How did you find that out?  How did you find

17  out now you can sign?

18     A     That's up to our quality control and our

19  senior vice-presidents.  When we have the

20  determination, they give the okay for the documents

21  to be printed.

22     Q     Okay.  So did they tell you or it's just the

23  fact that these showed up?

24     A     It's reasonable for me to assume when they

25  showed up that the resolution was in place.

12

```
 1        Q     And reasonable based on what?

 2        A     Common sense.

 3        Q     Okay.  When did these documents for Citi

 4   Residential Lending start showing up?

 5        A     It varies.  I don't recall.

 6        Q     Okay.  Do you recall signing papers for Citi

 7   based on some other documents?

 8        A     Yes.

 9        Q     Okay.  And what would that have been?

10        A     I can't recall specific documents.  Only I

11   can recall that I've signed for that account.

12        Q     Okay.  But my question was before you

13   learned of this document, did you sign papers for

14   Citi based on some other document?

15        A     I signed other documents for Citi as they

16   were produced.  I can't give an exact date.

17        Q     Okay.  So you were signing documents for

18   Citi without ever having seen Exhibit 4 which

19   authorized you to do that; is that correct?

20        A     Yes.

21        Q     Okay.  Now, let me let you see this again,

22   Exhibit 4, for a minute.  Okay.  It is signed in one

23   place by Timothy M. Hayes and another sheet by Sanjiv

24   Das and Paul R. Ince.  Do you know any of these

25   people?
```

Maxa Enterprises, Inc.     (727) 441-2404

13

1        A    No.

2        Q    Do you know that they are the executive

3   committee of the board of directors at Citi?

4        A    No.

5        Q    Okay.  Did you look them up to see who they

6   are?

7        A    No.

8        Q    Okay.  Did you get on Citi's web site to see

9   if they're the right people?

10       A    No.

11       Q    Did you rely on anyone else to do that

12  research?

13       A    Yes.

14       Q    Who?

15       A    My bosses.

16       Q    Okay.  Can you give names of particular

17  people you relied on?

18       A    Just the overall team:  The account set up,

19  the vice-presidents and so forth.

20       Q    Okay.  So did you ask them specifically,

21  "Are these the right three people to sign this so

22  that I'm covered?"

23       A    No.

24       Q    Okay.  Now, you just had Exhibit 4 in your

25  hand.  You can look at it again, but is there

14

1  anything -- any letterhead, any corporate seal,

2  anything that -- other than what it says, is there

3  anything that identifies it uniquely to Citi?  You

4  can see it again, if you would like.

5      A    No.

6      Q    Okay.  Did it come in any special binder or

7  any special letterhead?

8      A    I wouldn't know because I never saw it.

9      Q    Okay.  What does the document mean?

10     A    A document is variable.  It could be an

11  assignment.  It could be for a lease or satisfaction

12  of mortgage.  The document is just an instrument to

13  meet a particular need.

14     Q    Okay.  I'm not -- I'm sorry, I meant this

15  particular document, Exhibit 4.  What does that mean?

16     A    Oh, that means that I have the authorization

17  to sign on their behalf.

18     Q    And to sign as what?

19     A    Sign as an authorized signature.

20     Q    Okay.  But what title or description do you

21  sign as?

22     A    The way the signator works is depending on

23  the area that it's going to be recorded.  There's

24  stipulations whether it's a vice-president or

25  attesting secretary to meet the recording

Maxa Enterprises, Inc.    (727) 441-2404

1  requirements of that particular county or state.

2  That would be the designated title per document.

3      Q    Okay.  Did you say attesting secretary?

4      A    Yes.

5          MS. POLLAN:  Okay.  I'm going to go ahead

6      and object for the record.  This is speculation

7      because he's never seen this before other than

8      preparing for today.  The document speaks for

9      itself.

10          MS. EINSTEIN:  His understanding of it is

11      very relevant since it's been relied on.

12      Q    (By Ms. Einstein)  Okay.  The next item:

13  Any corporate resolution or any document showing your

14  position or authority with NTC.  Did you bring that

15  kind of a document?

16      A    No.

17      Q    Is there such a document?

18      A    No, not to my knowledge.

19      Q    Okay.  So there may be, but you don't know?

20      A    I don't know.

21      Q    Okay.  Any corporate resolution or other

22  document showing your position or authority with

23  Deutsche Bank?

24      A    I didn't bring any, but I have signed a

25  submission for the corporate resolution.  So I'm sure

16

1   one exists.  I just don't have it in my possession.

2       Q    Okay.  Well, what are you meaning by

3   submission?

4       A    Before we start an account the names of the

5   signers that are going to be approved are sent to the

6   corporation for approval, and not until the approval

7   is received back by us do we go forward.

8       Q    Okay.  So have you gone forward with signing

9   anything for Deutsche Bank?

10      A    Actually I've signed for Deutsche Bank,

11  yes.

12      Q    Okay.  All right.  All documents -- do you

13  have an idea of how many you signed for Deutsche

14  Bank?

15           MS. POLLAN:  I'm going to instruct him not

16      to answer.  That has nothing to do with this case.

17           MS. EINSTEIN:  Well, it's not one of the

18      things that were struck, and Deutsche Bank is the

19      Plaintiff.  I'm sorry, were you instructing him

20      not to answer?

21           MS. POLLAN:  I need a minute to think

22      about this.  If he signs for Deutsche Bank in this

23      case -- but he signed for Citi residential.  So

24      I'm going to instruct him not to answer.

25      Q    (By Ms. Einstein)  Okay.  The next thing you

Maxa Enterprises, Inc.    (727) 441-2404

17

1    were suppose to do -- to bring was all documents

2    showing your communications with Citi Residential

3    Lending concerning your duties as vice-president,

4    including telephone logs, notes on telephone calls,

5    e-mails and memos.

6         A    I have brought none because I have none.

7         Q    Okay.  Next is your job description as

8    vice-president of Citi Residential Lending.

9         A    I have brought none because my job

10   description simply is as signer.

11        Q    Okay.  The next item was records, including

12   travel records, showing all your meetings,

13   conferences or other contact with other officers of

14   Citi Residential Lending.

15        A    None exist.

16        Q    Okay.  And does that mean that no records

17   exist or none of these meetings, conferences or other

18   contacts exist?

19        A    None of them exist.

20        Q    Okay.  The next item was all your past and

21   present employment contracts at Citi Residential

22   Lending.

23        A    There's none.

24        Q    Okay.  Next was all corporate seals or

25   corporate stamps of which you have custody and

18

1   control, including those for Citi Residential Lending

2   and any other financial institution or business

3   entity.

4        A    I have none related to that.

5        Q    Okay.  You mean you have none of the things

6   I just described?

7        A    Correct.

8        Q    Okay.  All certificates, diplomas or any

9   other documentation showing any post-secondary

10  education, vocational training, certification courses

11  or other education and training received by you after

12  high school.

13       A    I have none.

14       Q    Okay.  Any document showing the authority of

15  Citi Residential Lending to act as Attorney-in-Fact

16  for Ameriquest Mortgage Company, and I believe that

17  is Exhibit 3.  So if I can have you look at that,

18  please.  Do you want to look at all the pages?

19            Okay.  Is this the -- is Exhibit 3 the only

20  document that meets the description in our request

21  any document showing the authority of Citi

22  Residential Lending to act as Attorney-in-Fact for

23  Ameriquest Mortgage Company?

24       A    I don't know.

25       Q    Okay.  When did you receive this?

1    A    I first saw this yesterday.

2    Q    Okay.  Before you learned of this paper, did

3  you sign papers -- documents involving Ameriquest

4  loans?

5    A    Yes.

6    Q    Okay.  And was that based on some other

7  document?

8    A    Based on knowing it wouldn't be presented to

9  me unless I had signing authority.

10    Q    Okay.  And that's just relying on the

11  management of your company; is that correct?

12    A    Yes.

13    Q    Okay.  Do you have signing authority for

14  Ameriquest?

15    A    I would say yes.

16    Q    Okay.  And what title do you use for

17  Ameriquest?

18    A    Depending on the state I'm an authorized

19  signer, and some states have different titles that

20  you have.

21    Q    Okay.  So you don't know what ones you use

22  for Ameriquest?

23    A    Not specifically.

24    Q    Okay.  Would some of those be -- would

25  vice-president be among them?

20

```
1      A    Yes.

2      Q    Okay.  Now, do you know the people -- we're

3   not done that with, sorry.  Do you know the people

4   whose names are on there at the end?

5      A    No.

6      Q    Okay.  Do you know that Eileen Rubens was a

7   vice-president of Ameriquest?

8      A    No.

9      Q    And so you wouldn't know if she was a real

10  vice-president or just someone with signing

11  authority?

12     A    I wouldn't know.

13     Q    Okay.  Did you make any inquiry to find out

14  who she is?

15     A    No.

16     Q    Okay.  And, again, that's a simple piece of

17  paper with typed words on it with nothing particular

18  identifying it with Ameriquest.

19          Did it come to you in any kind of folder or

20  binder or letterhead or anything that made you think

21  that it really was from Ameriquest?

22          MS. POLLAN:  I'm going to object, but you

23     can answer.

24          THE DEPONENT:  I was going to say, as I

25     stated before, that I didn't see this until
```

Maxa Enterprises, Inc.     (727) 441-2404

21

1    yesterday.

2        Q    (By Ms. Einstein)  Okay.  But you saw it in

3    exactly the form that it appears to be?

4        A    In this form.

5        Q    Okay.  Thank you.  We can give that back to

6    the court reporter.  Thank you.  Okay.  Now, do you

7    know what that document means?

8        A    No.

9        Q    Okay.  Did anyone other than your lawyer

10   tell you what it means?

11       A    No.

12       Q    Do you have any idea how that document

13   effects your job?

14       A    No.

15       Q    Okay.  The next item was any document

16   showing any consideration paid by the assignor or

17   assignee for the assignment you signed including a

18   printout of any electronic document or part of a

19   document, and the assignment we're talking about here

20   is this one, which we'll label 5.

21            MS. EINSTEIN:  And you'll have to stick it

22       over this, if you don't mind.

23       (Deposition Exhibit Number 5 was marked for

24   identification.)

25            THE DEPONENT:  Could you rephrase that,

1    please?

2    Q    (By Ms. Einstein)  Okay.  This is the

3    document that we're here in particular about, the

4    assignment that was signed of my client's mortgage.

5    A    Okay.

6    Q    And the request is any document showing any

7    consideration paid by the assignor or the assignee

8    for the assignment you signed.

9    A    So you're asking me if I have seen those

10    documents?

11    Q    Right, anything involving consideration.

12    A    No, I have not.

13    Q    Okay.  Any instructions you relied on in

14    preparing this Assignment of Mortgage including a

15    printout of any electronic document or part of a

16    document?

17    A    No.

18    Q    There were no instructions?

19    A    No.

20    Q    Okay.  All right.  You might as well

21    continue to hold that because that's -- I'm going to

22    ask more questions about it, but first let me ask you

23    did you review any other documents to get ready for

24    this deposition?

25    A    I am trying to think.  Just pretty much what

1    you have I think is what I was presented with.

2         Q    Okay.

3         A    That's my understanding.

4         Q    Okay.  So you don't recall any other

5    documents that you reviewed to get ready for this

6    deposition?

7         A    No.

8         Q    Okay.  And who is your employer, sir?

9         A    Nationwide Title Clearing.

10        Q    Do you have any other employer at this time?

11   Do you have any other jobs?

12        A    No.

13        Q    Okay.  What are the -- what past employment

14   have you had?

15        A    I've worked in insurance, and I've worked at

16   Eckerd's.

17        Q    Okay.  Before -- right before Nationwide

18   Title Clearing, where did you work?

19        A    It would be Eckerd's.

20        Q    Okay.  And what did you do there?

21        A    Remodeled, converted their stores.  It's in

22   the remodeling division.

23        Q    And you were an employee of Eckerd's,

24   however?

25        A    Right.

24

1      Q    Okay.  And what was your title in that

2  division?

3      A    I guess just remodeler, general labor.

4      Q    Okay.  And how long did you do that?

5      A    That was for a year.

6      Q    Okay.  And before that, what did you do?

7      A    Let me think here.  I worked as a temporary

8  through Spherion, and my assignment was at Valpak for

9  about three years.

10     Q    Okay.  Valpak is a company?

11     A    Yes.

12     Q    Okay.  And I think the court reporter will

13  probably want to know how you spell Spherion.

14     A    I think it's S-p-h-e-r-i-o-n.

15     Q    Okay.  And they assigned you to a temporary

16  job at Valpak?

17     A    Right, the coupon place.

18     Q    Oh, okay.  And what did you do there?

19     A    I sorted and loaded coupons for the mailers.

20     Q    Okay.  And before that, what did you do?

21     A    Let me see if we can go all the way back.  I

22  worked for a few years with a company called Bears

23  and Fairs in the carnival business.  This was in

24  promotions.

25     Q    Okay.  And before that?

25 .

1      A     That would be like seven years.  So we go

2   from that probably back to MTA Truck School where I

3   was an admission representative.

4      Q     Okay.  And that's a private truck driving

5   school --

6      A     Correct.

7      Q     -- is that what that is?  Okay.  And do you

8   remember what it was -- well, how long did you work

9   there?

10     A     Approximately a year and-a-half.

11     Q     Okay.  And do you know what did you before

12   that?

13     A     It would be I was selling insurance.

14     Q     Okay.  For a particular company?

15     A     For Guarantee Trust.

16     Q     Okay.  And was that here also in the Tampa

17   area?

18     A     No.  The only jobs in a temporary area would

19   have been Spherion and the Eckerd's, of course.  The

20   other jobs would be up north in Ohio.

21     Q     All right.  And what is your education, sir?

22     A     Just high school.

23     Q     Okay.  And have you had any vocational

24   training besides that?

25     A     No.

26

```
 1        Q     Okay.  Any certification programs?

 2        A     No.

 3        Q     Did you get any training by NTC?

 4        A     I'm trying to think how to phrase it.  A

 5   little bit of research, but not -- nothing with a

 6   certification.

 7        Q     Okay.  When you say research, can you

 8   explain what that means?

 9        A     Well, in addition to my job as signing, I

10   create cover sheets as required by the New York

11   Boroughs.  For example, Kings, Queens, the Bronx, and

12   they train me how to follow their web site to what

13   the county wanted.

14        Q     Okay.

15        A     It's not a certifiable course, but it's

16   something they trained me on.

17        Q     Okay.  So it's essentially to find

18   information and fill in the information on those

19   cover sheets?

20        A     Right, to make them recordable.

21        Q     Okay.  Any other training by NTC?

22        A     No.

23        Q     And I think you mentioned your job title is

24   signer?

25        A     Correct.
```

```
1        Q      Okay.  How long have you been a signer?

2        A      I've been a signer probably a little over

3    seven years.  I've worked there seven and a half.

4        Q      Okay.  So what were you before a signer?

5        A      I was -- they call it post scanning.  I was

6    assembling and reassembling mortgages to mail back to

7    clients or homeowners.

8        Q      Okay.  Explain the title signer.

9        A      It means that you're designated by the

0    company that -- the account that we're dealing with

1    to sign on their behalf to help execute the document.

2        Q      Okay.  How many in that title at NTC?

13       A      I wouldn't know because the corporate

14   resolution varied between 10 people and maybe as many

15   as 30 or 40 and sometimes --

16       Q      Okay.  But, I mean, do you mean how many

17   people at your job location are signers?

18       A      I don't know the exact number.

19       Q      Okay.  Is it more than 10 but less than 25

20   or is it like 100 or --

21       A      It's definitely less than 25.  I would say

22   the main signers are under a dozen.

23       Q      Okay.  But more than eight or --

24       A      Should I say on a typical day?  Would that

25   be what you're searching for?  I'm trying --
```

Maxa Enterprises, Inc.     (727) 441-2404

28

1      Q    Well, I'm searching for, you know, if you

2    ask me about my office, I would know how many

3    attorneys there are.  I'm wondering how many people

4    in your rank or job title that you know are there.

5      A    Well, I would say on the average day I'm

6    involved with eight or less signers.

7      Q    Okay.  All right.  What title is above

8    signer?

9      A    Document inspector.

10     Q    Okay.  Anything else?

11     A    The document completion director.

12     Q    Okay.  What title is below signer?

13     A    Processing.

14     Q    Okay.  And you told us you were briefly

15   doing processing.  Have you had any other titles at

16   NTC?

17     A    No, I have not.

18     Q    Okay.  Now, we're meeting at your lawyer's

19   office today.  So can you tell me where your office

20   is?

21     A    It's at 2100 Alternate 19 North, Palm

22   Harbor, Florida.

23     Q    Do you know how many people work there?

24     A    It varies between 200 and 350.

25     Q    Okay.  And they all work for NTC?

1      A      Correct.

2      Q      Okay.  So if there's like 8 to 12 signers,

3  and you mentioned a few other titles, what are most

4  of those 200 or 300 people doing?

5      A      Research, data entry and various other jobs

6  that are servicing our clients.

7      Q      Okay.  Do you have any idea how many work at

8  data entry?

9      A      No.

10      Q      Would that be most of the people?

11      A      It would be probably 20 percent of the

12  people, in that ball park.

13      Q      Okay.  So what would the other -- you know,

14  I'm sure there's some administration, but what

15  would -- the bulk of that large number of people,

16  what are they doing?

17      A      I really don't delegate that, but I think

18  the bulk is in the research --

19      Q      Okay.

20      A      -- and the qual area.

21      Q      Okay.  When you say research, what do you

22  mean by research?

23      A      Them verifying with the county records about

24  whether a stock memo is recorded and so forth,

25  whether it's by contact with abstractors or online,

```
1   things of that nature.
2        Q    Okay.  Are they verifying recordings or
3   verifying transactions?
4        A    I wouldn't know.
5        Q    Okay.  And does NTC have more than one
6   location?
7        A    Not to my knowledge.
8        Q    Okay.  Do you have an office there?
9        A    No.
10       Q    Okay.  A cubical?
11       A    Yes.
12       Q    Okay.  How many cubicles would you say are
13  in the room?
14       A    In my processing signing area?
15       Q    In sort of before you see a wall on all four
16  sides.
17       A    Well, the whole building?
18       Q    Well, if that's what the space is like, yes.
19       A    Well, the whole building would include data
20  entry and research and final docs and all the other
21  entities.  It would be cubicles for probably within
22  my building of over 200.
23       Q    Okay.  So -- and all those people are
24  essentially in one space separated by cubicles?
25       A    Correct.
```

| | | |
|---|---|---|
| 1 | Q | Okay. Do you have a phone on your desk? |
| 2 | A | No. |
| 3 | Q | Okay. Do you have a computer on your desk? |
| 4 | A | Not on my desk, next to my desk. |
| 5 | Q | Okay. I mean, is the monitor on your desk? |
| 6 | A | No. It's on the desk next to me. |
| 7 | Q | Okay. |
| 8 | A | The one that I use. |
| 9 | Q | Okay. Is that somebody else's desk or -- |
| 10 | A | No. I have two desks. |

11    Q    Okay. So you have a computer on your other

12 desk?

13    A    Right.

14    Q    Okay. What our equipment do you have, sir?

15    A    Just pens, paper clips, you know, standard.

16    Q    Okay. How has your work changed since you

17 began as a signer?

18         MS. POLLAN: I'm going to object. I don't

19    know how -- what this has to do with the

20    assignment or even this case.

21         MS. EINSTEIN: Well, I mean --

22         MS. POLLAN: As far as the order is

23    concern is where my objection lies.

24    Q    (By Ms. Einstein) Okay. Now, let's go back

25 to Citi in particular. How long have you been a

1   vice-president.

2        A     I don't recall.

3        Q     Okay.  Do you recall any qualifications you

4   had to show them to be a vice-president?

5        A     The only qualifications I know is that they

6   do a background check on you before they submit your

7   name for corporate resolution.

8        Q     Okay.  And by "they", are you meaning NTC

9   does the background check?

10       A     Correct.

11       Q     Okay.  Have you gotten any training from

12  Citi directly?

13       A     No.

14       Q     Okay.  Have you spent any time at their

15  place of business?

16       A     No, I haven't.

17       Q     Do you know where their place of business

18  is?

19       A     No.

20       Q     Okay.  So is there anyone you report to at

21  Citi?

22       A     No.

23       Q     Okay.  And is there any department at Citi

24  that you deal with?

25       A     No.

33

1      Q     Okay.  Do you have any idea how many other

2   vice-presidents there are at Citi?

3      A     No, I do not.

4      Q     Okay.  Do you know how many other

5   vice-presidents are working for NTC?

6      A     No.

7      Q     And have you ever met another vice-president

8   besides those at NTC?

9      A     No.

10      Q     Okay.  If you have a problem or a question

11   about one of the Citi assignments you're suppose to

12   sign, who do you contact?

13      A     The only problem I have when I sign a

14   document, the qual that I do is on the printing

15   quality.

16          In other words, is this legible enough to be

17   recorded, and if it's not or not within the margins

18   by the view, I submit it to our printing IC to

19   reprint it.

20      Q     Okay.  And IC would stand for?

21      A     In charge.

22      Q     Oh.

23      A     In charge of printing.

24      Q     Okay.  So if it's legible and the margins

25   are right, that's all you look at?

34

```
 1        A      Correct.

 2        Q      Okay.  What questions have you asked your

 3   supervisor about Citi assignments?

 4        A      None.

 5        Q      Okay.  Now, we're going to be talking

 6   specifically about the assignment that you have in

 7   front of you, which is labeled Exhibit 5.  Okay.

 8   Now, Exhibit 5 is in front of you.  Do you have any

 9   specific memory of this assignment?

10        A      No.

11        Q      Okay.  Do you know about it because of the

12   general processes you use?

13        A      I had never seen this until yesterday.

14        Q      Okay.  Do you recognize your signature on

15   it?

16        A      Yes.

17        Q      Okay.  Was that a signature you physically

18   signed?

19        A      No.

20        Q      Okay.  Can you tell me how your signature

21   got on it?

22        A      With corporate resolution the account set-up

23   guy, Tom McKinnon, came by for signatures to scan for

24   counties that wanted E-recordings, and so they

25   scanned my signature.
```

35

1      Q    Okay.  And Tom McKinnon is an employee of

2   NTC?

3      A    Yes.

4      Q    And the first thing you said it was

5   corporate something?

6      A    Yeah.  In other words, I have the

7   corporate -- I know I'm allowed to sign for this

8   company.  So then I submit my signature to Tom to

9   scan.  It's not like a blank signature to sign.

10  anywhere.

11           MS. POLLAN:  Can I take a quick break?

12           MS. EINSTEIN:  Sure.

13           MS. POLLAN:  Thank you.

14           (A brief recess was held.)

15      Q    (By Ms. Einstein)  We are back on the

16  record.  Okay.  Mr. Bly, right before we took a break

17  you were telling me that you had not ever seen

18  Exhibit 5 before and that your signature on there was

19  done by an electronic process, that you had given an

20  exemplar to an NTC employee named Thomas McKinnon; is

21  that correct?

22      A    That's correct.

23      Q    Okay.  When did you do that, sir?

24      A    I don't recall.

25      Q    Okay.  And was that specifically for Citi?

Maxa Enterprises, Inc.     (727) 441-2404

36

1    Was that for any signing you would do?

2        A    I don't recall.

3        Q    Okay.  Now, the specific document that

4    Exhibit 5 that has your signature, who actually

5    created it?

6        A    I don't know.

7        Q    Okay.  Was it somebody at NTC?  Do you know

8    that?

9        A    I would assume.

10       Q    Okay.  Do you know the title of a person who

11   would create that document and put your signature on

12   it?

13       A    No.

14       Q    Okay.  Do you know how many people do that

15   job?

16       A    No.

17       Q    Okay.  Do you know where it gets done?

18       A    No.

19       Q    Okay.  So you don't know the actual person

20   who pushes a button, clicks a mouse, does something,

21   and suddenly your signature gets on the piece of

22   paper?

23       A    No.

24       Q    Okay.  So you don't supervise these people

25   that apply your signature to documents; is that

37

1 correct?

2  A  That's correct.

3  Q  Do you know who supervises them?

4  A  No.

5  Q  Okay.  Do you have any communication with

6 them about what documents they are applying your

7 signature to?

8  A  No.

9  Q  Okay.  Does anyone ever come to ask you

10 about a particular document, should you -- you know,

11 should your signature go on it?

12  A  No.

13  Q  Okay.  Do you know about any procedures that

14 are in place to check these documents?

15  A  No.

16  Q  Okay.  Now, do you know anything about how

17 your signature or your E-signature would have been

18 notarized?

19  A  I don't know the technical end and all the

20 encryptions and all that, no, I don't.

21  Q  Okay.  Can you tell whether the notarization

22 is also done electronically on that?

23  A  I would assume.

24  Q  So you know that notarizations are done

25 electronically?

1    A    Correct.

2    Q    And you assume that it was done in this

3    case?

4    A    Correct.

5    Q    But you have no way of telling if it was

6    real or not, if it was physically signed or

7    electronically notarized?

8    A    No.

9    Q    Okay.  Now, the notary -- okay.  Since

10   you're not actually signing this, there's no way the

11   notary can be watching you sign it.  Would that be a

12   fair statement?

13   A    Yes.

14   Q    Okay.  Now, do you know from your own

15   experience that -- have you authorized your

16   notary -- your signature to be used as a notary

17   through this electronic process?

18        MS. POLLAN:  I'm going to object because

19   he didn't notarize this document, and otherwise

20   based on the order this has nothing to do with

21   this case.

22        MS. EINSTEIN:  Well, except that since he

23   has no actual knowledge his knowledge of the

24   process is --

25        MS. POLLAN:  He's already told you what he

39

```
1      knows about the process.  So because he didn't

2      notarize this document, I'm going to object based

3      on the order.

4             MR. EINSTEIN:  Okay.  Are you going to

5      instruct him not to answer?

6             MS. POLLAN:  Yes.

7      Q      (By Ms. Einstein)  Okay.  Where did these

8  assignments go after they leave NTC?

9      A      I don't know.

10     Q      Do you know where they end up?

11     A      No.

12     Q      Do they go all over the state of Florida or

13 do they go to other states?

14     A      I have no knowledge where they go

15 individually.

16     Q      Okay.  Would it surprise you to learn that

17 they're filed in public land records along with deeds

18 and mortgages?

19             MS. POLLAN:  Object to form, but you can

20     answer.

21             THE DEPONENT:  I -- through our volume, I

22     wouldn't be surprised.  We do a lot of products

23     for customers.

24     Q      (By Ms. Einstein)  Okay.  Can you tell me

25  what that assignment accomplishes?
```

40

1     A     No.

2     Q     Okay.  Is there anything you know that would

3  indicate whether it could be used to foreclose on

4  somebody's house?

5     A     No.

6     Q     Okay.  Did you know that that's what some

7  of -- that's what that document is being used for?

8     A     No.

9     Q     Okay.  Now, do you say you're a

10  vice-president of Citi when you're applying for a

11  credit card?

12     A     No.

13     Q     Okay.  Or applying for an apartment to live

14  in?

15     A     No.

16     Q     Applying for a car loan?

17     A     No.

18     Q     If you met someone socially and they said

19  what do you do, would you say you're a vice-president

20  of Citi?

21     A     No.

22     Q     Okay.  Why not?

23     A     Because my capacity with Citi is limited to

24  signing.

25     Q     Okay.  Now, is there anything on that

1    document, Exhibit 5, which says your capacity is

2    limited in any way?

3        A    No.

4        Q    Now, what investigation do you do to know

5    that the company doing the assignment really owns the

6    thing that they are assigning away?

7        A    None.

8        Q    Okay.  And do you do any investigation to

9    know that the right company is getting the

10   assignment?

11       A    None.

12       Q    Okay.  Have you ever had someone tell you

13   that you signed an assignment, and it had the wrong

14   information on it?

15       A    No.

16       Q    Okay.  Do you also sign endorsements?

17           MS. POLLAN:  I'm going to object based on

18       the order.  I'm going to instruct you not to

19       answer.

20       Q    (By Ms. Einstein)  Okay.  Do you sign

21   affidavits?

22           MS. POLLAN:  I'm going to also object.

23       There's no affidavit in this case.

24       Q    (By Ms. Einstein)  Since February are you

25   signing verifications of court pleadings?

42

1          MS. POLLAN:  Object.  There's no court

2     pleadings assigned in this case.

3     Q     (By Ms. Einstein)  Okay.  Now, let's talk

4     about the specific terms in the assignment, and

5     that's the document in front of you, Exhibit 5.

6          It says at the top American Home Mortgage

7     Services Company care of NTC.  Do you see that?

8     A     Yes.

9     Q     Okay.  Does American Home Mortgage Servicing

10    have an office at NTC?

11    A     No.

12    Q     Does it have an office at Palm Harbor at

13    all?

14    A     No.

15    Q     So if the assignment that I was reading to

16    you as -- do you agree that it says return to

17    American Home Mortgage Service, Inc.?

18          MS. POLLAN:  Object to form.

19    Q     (By Ms. Einstein)  Okay.  What does it say

20    under return to?

21    A     American Home Mortgage Service, Inc., care

22    of NTC.

23    Q     Okay.

24    A     2100 Alternate 19 North.

25    Q     Palm Harbor, right?

43

1    A    Palm Harbor, yeah, Florida, 24683.

2    Q    So if it comes back to that address, where

3  does it go after that?

4    A    It comes back there for additional

5  processing.

6    Q    And what does that consist of?

7    A    The -- I don't know exactly, but I would

8  assume retrieving the recording information when it

9  was submitted to the County on the book and page and

10  things of that nature.  Then the document is mailed

11  back from the County.

12    Q    And then what happens?

13    A    It depends upon the contract with the

14  client.  I wouldn't know.

15    Q    Okay.  And in this case the client would be

16  Citi or would the client be some other entity or can

17  you tell?

18    A    I can't tell.

19    Q    Okay.  Now, under that return to thing we

20  were just discussing, there is a CRL number.  Do you

21  know what that means?

22    A    No.

23    Q    Okay.  There's also an assignee number.  Do

24  you know what that means?

25    A    No.

44

1        Q     There's also an investor number?

2        A     No.

3        Q     Okay.  And it also said custodian.  Do you

4    know what that means?

5        A     No.

6        Q     Okay.  Now, if you don't know, who would

7    know what these numbers refer to?

8        A     I'd have to speculate.

9        Q     Okay.

10       A     It would be --

11              MS. POLLAN:  I object, but --

12              THE DEPONENT:  Well, it would be with

13    quality control and the people that put the loan

14    together.

15       Q     (By Ms. Einstein)  Okay.  But you don't know

16    who that is or --

17       A     No, not specifically.

18       Q     Okay.  Is there a database where you can

19    look them up that you have access to?

20       A     No.

21       Q     Okay.  Have you ever asked anyone else at

22    NTC what those numbers mean or --

23       A     No.

24       Q     Okay.  Did you ever check them to see if

25    they were correct?

Maxa Enterprises, Inc.      (727) 441-2404

1      A     No.

2      Q     Okay.  Now, under that there is something

3  indicating an effective date, which is February 11th

4  of '09.  Do you see that?

5      A     Yes.

6      Q     Okay.  Now, if you look down at the bottom,

7  it appears it was notarized on February 13th of '09.

8      A     Where it says dated.

9      Q     Is that yes?

10     A     Yes.

11     Q     Okay.  The -- do you know why it says the

12  effective date is different from the date of the

13  notarization?

14     A     No.

15     Q     Do you know in general why an effective date

16  would be different from the date notarized?

17     A     No.

18     Q     Do you know who puts the effective date on

19  there?

20     A     No.

21     Q     Okay.  Going further down now into the body

22  of the paragraph there, it says for good and valuable

23  consideration.  What does that mean?

24     A     I don't know.

25     Q     Okay.  Do you know anything about how much

46

```
 1    was paid for this mortgage?

 2         A    No.

 3         Q    Or anything about when?

 4         A    No.

 5         Q    Anything about what company paid it?

 6         A    No.

 7         Q    Anything about what company got it?

 8         A    No.

 9         Q    Do you know whether anything was paid at

10    all?

11         A    No.

12         Q    Okay.  Now, how do you know that Citi -- it

13    does then say Citi Residential Lending as

14    Attorney-in-Fact for Ameriquest Mortgage Company; is

15    that correct?

16              MS. POLLAN:  Object to form, but you can

17       answer.

18         Q    (By Ms. Einstein)  Would you read the next

19    part after the for good and valuable consideration?

20         A    Let's see, Citi Residential Lending,

21    Incorporated as Attorney-in-Fact for Ameriquest

22    Mortgage Company.

23         Q    Okay.  What does Attorney-in-Fact mean?

24         A    I don't know.

25         Q    Okay.  How do you know that Citi Residential
```

Maxa Enterprises, Inc.     (727) 441-2404

47

 1   Lending is an Attorney-in-Fact for Ameriquest

 2   Mortgage Company?

 3       A    I don't know.

 4       Q    Okay.  Do you know whose address that is

 5   Rancho Cucamonga, California?

 6       A    No.

 7       Q    Okay.  The next thing:  By these presence

 8   does convey, grant, sell, assign, transfer and set

 9   over.  Do you see that in the document?

10       A    Yes.

11       Q    Okay.  Do you know what that means?

12       A    No.

13       Q    The next thing is Deutsche Bank National

14   Trust Company as trustee for.  Do you see that in the

15   document?

16       A    Yes.

17       Q    Do you know what a trustee is?

18       A    No.

19       Q    Okay.  Would you know why Erika Lance said

20   you don't ever transfer mortgages into trusts?

21           MS. POLLAN:  I'm going to object.  Erika

22       Lance is not in this case, and I'm going to object

23       based on the order because that has nothing to do

24       with this case.

25           MS. EINSTEIN:  But it has to do with what

1      exactly is there.

2            MS. POLLAN:  Well, he should know what

3      Erika Lance should know.

4      Q    (By Ms. Einstein)  Okay.  Is Erika Lance the

5      senior vice-president for administration?

6      A    Yes.

7      Q    Okay.  Do you think she knows what your

8      company does and doesn't do?

9      A    I can't comment on to what degree her

10     knowledge is --

11     Q    Okay.

12     A    -- because it would be speculation.

13     Q    All right.  Continuing back with this

14     Exhibit 5, do you see asset-backed pass-through

15     certificates?

16     A    Yes.

17     Q    Do you know what that means?

18     A    No.

19     Q    Okay.  Then do you see pooling and servicing

20     agreement?

21     A    Yes.

22     Q    Do you know what that means?

23     A    No.

24     Q    Do you see whose address -- oh, I'm sorry,

25     do you see an address in Santa Ana, California?

49

1      A     Yes.

2      Q     Do you know whose address that is?

3      A     No.

4      Q     Okay.  Now, going back down to your

5   signature.

6      A     Okay.

7      Q     Do you see underneath that it says whose

8   address is 10801 East 6th Street, Rancho Cucamonga,

9   California?

10     A     Yes.

11     Q     Is that your address?

12     A     No.

13     Q     Have you ever been there?

14     A     No.

15     Q     Okay.  Who is Jessica Fretwell?

16     A     She's an employee of NTC.

17     Q     Okay.  Do you know what she does?

18     A     Not specifically.

19     Q     Okay.  Well, do you know generally what she

20  does?

21     A     Her duties vary.  She prepares some

22  documents.

23     Q     Okay.  When you say she prepares them, what

24  would that mean in specific relation to that

25  document?

1    A    I wouldn't know because I didn't see her
2  process or create.
3    Q    Okay.  So does she create documents like
4  that by adding electronic signatures too?
5    A    I couldn't accurately describe what she
6  does.
7    Q    Okay.
8    A    I have no knowledge.
9    Q    Okay.  Let's go back to when you gave your
10  signature to Thomas McKinnon.
11    A    Okay.
12    Q    Did you authorize specific people at NTC to
13  use your signature?
14    A    No.
15    Q    Okay.  Did you sign anything saying this is
16  really my signature?
17    A    I'm trying to think.  No.
18    Q    Did you sign anything saying they could use
19  your signature?
20    A    No.
21    Q    Okay.  Did you say anything to anyone
22  saying, "Here's my signature.  Use it in such and
23  such a way or any way you want," or --
24    A    No.
25    Q    Okay.  Back to Exhibit 5, what are the

51

```
 1    numbers above the bar code?  Do you see at the bottom
 2    there's a bar code?
 3         A    Okay.
 4         Q    There's some numbers above it.  Can you tell
 5    me what those are?
 6         A    The C-R-L-A-S and then the numbers?
 7         Q    Yes.  What are those?
 8         A    That would be a document identification
 9    number.
10         Q    Okay.  And that would be within NTC?
11         A    Within NTC.
12         Q    Okay.  Can you using that number access this
13    document or can only certain other people do it?
14         A    Only certain other people can.
15         Q    Okay.  Do you know who those are?
16         A    Not specifically.
17         Q    Okay.  What about the number below the bar
18    code?
19         A    It's the same as the identifier.
20         Q    Within NTC?
21         A    Within NTC.
22         Q    Okay.  And do you have access to know what
23    it means?
24         A    I just know that number is the number they
25    use when they research or do anything with this loan
```

Maxa Enterprises, Inc.    (727) 441-2404

52

1    or if they have to retrieve it to print, this is the

2    number they use for identification purpose.

3         Q    But you're not able to do that?

4         A    No.

5         Q    Okay.  Now, in this loan, which you sign the

6    assignment of, did you see the original note or

7    mortgage change hands?

8         A    No.

9         Q    Okay.  Do you know where the original note

10   and mortgage are now?

11        A    No.

12        Q    Do you know where they were, excuse me, when

13   you signed the assignment?

14             MS. POLLAN:  Object.

15             MS. EINSTEIN:  I'm sorry?

16             MS. POLLAN:  I'm objecting to form.  You

17        can answer.

18             THE DEPONENT:  Okay.  Well, I wouldn't

19        know because I didn't sign this.  This was done

20        electronically.

21        Q    (By Ms. Einstein)  Okay.  If you had

22   physically signed it, would you know where those

23   documents were?

24        A    No.

25        Q    Okay.  Do you know anything at all about the

53

1    original mortgage and note in this case?

2        A    No.

3        Q    Okay.  Now, have you ever signed this

4    mortgage before February 13, 2009?

5        A    I don't know.

6        Q    Okay.  So there's nothing in your process

7    that would have prevented you from signing this

8    mortgage other times?

9        A    Can you rephrase that?

10       Q    Okay.  Exhibit 5 you assign it from Citi

11   Residential as Attorney-in-Fact for Ameriquest to

12   Deutsche Bank as trustee with certain other

13   stipulations of what they're trustee for.

14       A    Okay.

15       Q    Okay.  Is there -- do you know if you could

16   have assigned this mortgage to some other company?

17       A    No.

18       Q    Meaning you could have?

19       A    I don't -- I have no way of recalling.

20       Q    Okay.  And would you have any way of finding

21   out?

22       A    No.

23       Q    Okay.  So before assigning a mortgage, you

24   don't check to see if it has been assigned to some

25   other company?

54

1    A    Correct.

2    Q    Okay.  And similarly you have no way of

3  knowing if you have signed an assignment of this

4  particular mortgage after February 13th of '09; is

5  that right?

6    A    Correct.

7    Q    Okay.  And that would be true even if it was

8  a few days before because of the volume that you sign

9  or that are signed with your name; is that correct?

10   A    Correct.

11   Q    Okay.  And I think you testified a little

12  before that no one ever told you that an assignment

13  you signed was incorrect?

14   A    Correct.

15   Q    Okay.  Do you know how many people work for

16  quality control?

17   A    No.

18   Q    Okay.  Do you know how many assignments they

19  process a day?

20   A    Not exactly.

21   Q    Between 100 and 1,000 or between 1,000 and

22  10,000?

23   A    Would it be proper to give you a ball park

24  of --

25   Q    Yes.

1    A    -- an average day?

2    Q    Yes.

3    A    Would that be acceptable?

4    Q    Yes.  That's what I'm asking you.

5    A    I would say on a daily it varies between two

6    and 5,000 documents whether assignments -- two and

7    $5,000 documents of whatever nature.

8    Q    And that's what goes through quality control

9    or is that what you do?

10    A    That's what I would do.  It would go through

11    quality before it came through me.

12    Q    Okay.  So there are other people who do what

13    you do, which also have to go through quality?

14    A    Yes.  There's several layers of quality.

15    Q    Okay.  Do you know how many?

16    A    Not exactly, but there's quality in the data

17    and then the creation of the docs -- quality before

18    it's printed, and then I sign and quality after I

19    sign.  So in reviewing it in every capacity, qual and

20    research and so forth.

21    Q    Okay.  And the research is whether it has

22    been recorded; is that correct?

23    A    Well, not that narrow of a scope.  I mean,

24    to find anything, if the title is clear, whatever is

25    required if the assignment changed in correct order

56

```
 1    and so forth.  It's pretty extensive.
 2         Q    Okay.  And how many people are doing that
 3    for how many assignments?
 4         A    Well, research could be 60 people or more
 5    depending on the given situation or the quality of
 6    their information that they're receiving from the
 7    client.
 8         Q    Okay.  So all of these people with all of
 9    this research, and no one has ever come back and
10    said, hey, wait, something was wrong to you?
11         A    Not to my knowledge at all.
12         Q    Okay.  And you've said what you check
13    yourself is the clarity of the print and whether it's
14    entered on the page; is that correct?
15         A    Correct.
16         Q    Now, are you paid by the hour or by the
17    assignment or --
18         A    I'm paid by the hour.
19         Q    Okay.  What would be the outside limits of
20    how many you would sign in a day?
21         A    Two to 5,000 would be on an eight-hour day.
22         Q    Okay.  And what is it varied by?  I mean,
23    seasonal?  Is it -- what does it depend on?
24         A    By the contract situation.
25         Q    Okay.  And has there been a trend over
```

57

1    time?

2         A     Seasonally not actually.  It's variable.

3         Q     When you sign by hand, where do the

4    assignments come from?

5              MS. POLLAN:  I'm going to object based on

6         the order.  He didn't sign this by hand, and you

7         have already gone through that process.

8              MS. EINSTEIN:  Are you instructing him not

9         to answer?

10             MS. POLLAN:  Yes.

11        Q     (By Ms. Einstein)  Okay.  And the

12   E-signatures you've testified you never see it.  It's

13   all based on a signature you gave to Thomas McKinnon

14   sometime ago.  So -- and you don't know when; is that

15   correct?

16        A     Correct.

17        Q     And you don't know when or how the

18   notary -- notarization is effected?

19        A     That's correct.

20        Q     Okay.  So you don't know how many of those

21   bear your name that go out in a day?

22        A     That would be correct.

23        Q     Okay.  Is there any other form besides hand

24   signing and E-signatures that your name has gotten

25   onto documents, a stamp or something like that?

58

1      A     No.

2      Q     Okay.  Has E-signing reduced your work

3   load?

4      A     I would assume, yes.

5      Q     Okay.  Do you still notarize for other

6   people at NTC?

7      A     Yes.

8      Q     Okay.  And do you know how often?

9            MS. POLLAN:  I'm going to object and

10      instruct him not to answer.  That has nothing to

11      do --

12      Q     (By Ms. Einstein)  Okay.  Have you

13   registered with the commissioning official that you

14   do E-notarizations?

15      A     To my knowledge, I don't do E-notarizations.

16      Q     Okay.  Now, have you stopped signing

17   assignments?

18      A     No.

19      Q     Okay.  Has the pace slowed at all?

20      A     Like I said before, it's variable.

21      Q     Okay.  Has Citi stopped sending assignments

22   to sign?

23      A     No.

24      Q     Okay.  And has the pace of Citi assignments

25   specifically slowed?

Maxa Enterprises, Inc.     (727) 441-2404

59

1      A      They're variable.

2      Q      Okay.  Has anyone other than your lawyer

3  told you that assignments don't matter anymore?

4      A      No.

5              MS. EINSTEIN:  Okay.  Okay.  Do you have

6      anything you want to ask?

7              MS. POLLAN:  If I could take a brief

8      recess and just talk with Bill and see.  We

9      probably will do some cross-examination.

10             MS. EINSTEIN:  Okay.

11             MS. POLLAN:  Thank you.

12             (A brief recess was held.)

13             MS. POLLAN:  Okay.  We're back on the

14     record.

15                    EXAMINATION

16  BY MS. POLLAN:

17     Q      Okay.  Mr. Bly, I'm only going to ask you a

18  handful of questions.  Do you remember when

19  Ms. Einstein was asking you about your knowledge at

20  the time you signed Exhibit 5?  Do you remember

21  that?

22     A      Yes.

23     Q      Okay.  Do you remember when Ms. Einstein

24  asked you whether you knew at the time you signed

25  Exhibit 5 whether or not it had been assigned before

Maxa Enterprises, Inc.      (727) 441-2404

60

1  or if the information was accurate?  Do you remember

2  that?

3      A    Yes.

4      Q    When you signed this document, did you rely

5  on your own knowledge?  And when I say this document,

6  I mean Exhibit 5.  Do you rely on your own knowledge

7  or the process at Nationwide?

8      A    I rely on the process.

9      Q    Okay.  And when I say the process, is that

10 the same one that you -- with quality control that

11 you had described to Ms. Einstein?

12     A    Right, the multilayer quality control and

13 security.

14         MS. POLLAN:  Okay.  That's all the

15     questions that I have.

16         MS. EINSTEIN:  Okay.  And I want to ask

17     about that.

18                    EXAMINATION

19 BY MS. EINSTEIN:

20     Q    Do you know what the quality control -- how

21 much time the quality control spends on each

22 assignment checking it?

23     A    I don't know exactly.  I do know it varies

24 upon a verification, variability to verify what's

25 there.

Maxa Enterprises, Inc.    (727) 441-2404

61

1      Q     What are they verifying it with?

2      A     It's variable.

3      Q     Do you know what they're checking or you

4   just know --

5      A     No.  It would be just speculation, but I

6   would assume, for example, when the physical files

7   are sent in, that's easier to inspect than if they're

8   looking up something online and so forth.

9      Q     Are there physical files sent in?

10      A     Sometimes, yes.

11      Q     Okay.  Do you know when they are and when

12   they aren't?

13      A     No, I wouldn't.

14      Q     Okay.  And when you say it's easier

15   than -- well, what's in the physical files?

16      A     That varies per file, per account.

17      Q     You don't know, do you?

18      A     No, I don't know.

19      Q     Okay.  And do you know the qualifications of

20   the people in quality control?  Do you know what

21   their training is?

22      A     No, I do not.

23      Q     Okay.  And do you know what their education

24   is?

25      A     No.

62

1      Q    Okay.  Do you know how long they have worked

2  there?

3      A    No.

4      Q    Does that vary?

5      A    Somewhat.

6      Q    How much bigger is NTC than when you started

7  working there seven and-a-half years ago?

8      A    Currently we're about the same when I

9  started, 300 some employees, 350 right now.

10      Q    Okay.  And what would you say is the

11  turnover?

12      A    That's hard to speculate.  It depends upon

13  the volume.

14      Q    Okay.  So you don't know how long these

15  people have been working there.  You don't know their

16  training.  You don't know what they check.  You don't

17  know their education, and you don't know how much

18  time they spend?

19      A    Well, I don't know exactly individually, but

20  the main people in qual have been there longer than I

21  have.

22      Q    Okay.  And who are they?

23      A    Well, Phillip Wood is one of the

24  individuals.

25      Q    Okay.  And do you know what his education or

63

1    training is?

2       A    No.

3       Q    Okay.  And do you know the names of any

4    others?

5       A    I really couldn't list them.

6       Q    Okay.  And when they do qual, again, you

7    don't know how much time they spend or what they look

8    at?

9       A    No, I do not.

10      Q    Sometimes they have a paper file, sometimes

11   they don't; is that correct?

12      A    That's correct.

13      Q    Okay.  Is there anything else you know that

14   quality control does specifically with assignments

15   before you get them or before your name is applied to

16   them?

17      A    No.

18      Q    Okay.  Do you know if one person checks

19   everything in an assignment or --

20      A    No.  I don't know.

21      Q    Okay.  And if they check it, why do they

22   need you, sir?

23      A    As signer.

24           MS. EINSTEIN:  Okay.  I have nothing

25       further.

Maxa Enterprises, Inc.    (727) 441-2404

1              MS. POLLAN:   Okay.   We don't have any

2        other questions.   We are going to read.

3              (The deposition was concluded at 3:50 p.m.)

4                          *  *  *

5        I hereby certify that I have read and examined the
         foregoing transcript, and the same is a true record
6        of the testimony given by me unless otherwise noted.

7

8                    _____        _____
                     BRYAN J. BLY                    DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25